IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| T.B., Jr. ex rel. T.B., Sr. and F.B. | * | |
| Plaintiffs, | * | |
| v. | * | Case No.: GJH-15-03935 |
| | * | |
| PRINCE GEORGE'S COUNTY BOARD OF EDUCATION, *et al.* | | |
| | * | |
| Defendants. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiffs appeal the decision in *T.B., Jr. v. Prince George's County Public Schools*, OAH

No.: MSDE-PGEO-OT-15-01496 (2015)[1] by David Hofstetter, an Administrative Law Judge of

the Maryland Office of Administrative Hearings ("the ALJ") under the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. §1400 *et seq.*[2] Presently pending before the

Court is Plaintiffs' Motion for Summary Judgment on the Administrative Record, ECF No. 27,

and Defendants' Cross Motion for Summary Judgment, ECF No. 28. A hearing on the motions

was held on October 17, 2016. Local Rule 105.6 (D. Md. 2016). For the following reasons,

Plaintiffs' Motion for Summary Judgment is now denied, in part, and granted, in part, and

Defendants' Cross Motion for Summary Judgment is granted, in part, and denied, in part. The

---

[1] The Administrative Law Judge's Decision is cited herein as "ALJ."

[2] Congress first enacted the Individuals with Disabilities Education Act ("IDEA") in 1970, then called the Education of the Handicapped Act, "to ensure that all children with disabilities are provided a free appropriate public education which emphasizes special education and related services designed to meet their unique needs and to assure that the rights of such children and their parents or guardians are protected." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009) (internal citations omitted).

ALJ's Decision is thus affirmed, in part, and reversed, in part. Defendants shall reimburse Plaintiffs for the cost of the Independent Education Evaluation.

## I.      BACKGROUND

### A.  Factual History[3]

T.B.[4] was born on July 25, 1998. T.B. began attending Prince George's County Public Schools ("PGCPS") in elementary school. ALJ at 8. Although T.B. consistently performed below grade level in Reading and Math throughout his elementary school career,[5] T.B. was never diagnosed with a disability or placed in special education during this time. In 5th Grade, T.B. received "mostly As and Bs, except for Cs in Reading and Writing." ALJ at 9. In 6th Grade, T.B. received three As, two Bs, and one C. *Id.* When T.B. reached seventh grade at Gourdine Middle School, however, his grades began to decline. ALJ at 9; ECF No. 1 at 8–9. T.B. received numerous Ds and failing grades throughout seventh and eighth grades. ALJ at 9; ECF No. 1 at 8–9. His teachers commented that T.B. "[did] not follow instructions" and had "[m]issing/incomplete assignments" and "[p]oor test/quiz grades." ECF No. 1 at 9.

In the Fall of 2012, T.B. entered high school at Friendly High School. ALJ at 9. According to Plaintiffs' Complaint, T.B.'s academic decline "continued and intensified." ECF No. 1 at 10. On October 12, 2012, T.B.'s father, Mr. Barton, emailed the school Guidance Counselor, Desirae Dent, under the subject heading, "Having my son get tested." *Id.* On November 7, 2012, the school held an IEP meeting[6] concerning T.B. ALJ at 9; ECF No. 1 at 10.

---

[3] All facts herein are taken from the ALJ's Findings of Facts, *Terrence Barton, Jr. v. Prince George's County Public Schools*, OAH No.: MSDE-PGEO-OT-15-01496 (2015), or Plaintiffs' Complaint, ECF No. 1, where noted.

[4] Although T.B. has reached the age of majority since the filing of the Complaint, the Court will continue to refer to him by his initials to mirror the pleadings.

[5] Annual standardized testing from 1st through 6th Grade indicated that T.B. was performing below grade level ("Basic" rather than "Proficient") in both Reading and Math. ECF No. 1 at 8.

[6] An individualized education program or "IEP" is a written statement for a child with a disability that sets forth, among other things, the child's present levels of academic achievement and functional performance, measurable annual goals, a description of how the child's progress toward meeting the annual goals will be measured, the

T.B.'s mother, Mrs. Barton, and several PGCPS staff were present; however, none of T.B.'s classroom teachers attended the meeting. ALJ at 10. While the IEP team did not conduct formal testing of T.B., the team concluded on "all available information" that his difficulties were not the result of a learning disability or any condition requiring special education services, and did not order further assessments. ALJ at 10. At the meeting, the IEP team gave T.B.'s mother the Maryland State Department of Education document "Parental Rights – Maryland Procedural Safeguards," which provides information on how to file a due process complaint and the applicable statute of limitations. *Id.* at 9.[7] The team agreed to schedule a parent-teacher conference for January 2013. *Id.* at 10.

As T.B. progressed through ninth grade, he continued to struggle in school and miss class. ALJ at 9–10. Mr. Barton again emailed Ms. Dent on the 4th and 10th of January 2013, asking about possible programs and smaller classes for T.B. ALJ at 9. Friendly High School held parent-teacher conferences on January 16, 2013. ALJ at 10. Mr. and Mrs. Barton attended and discussed T.B.'s lack of motivation and failure to come to class with some of his teachers, the principal, and other PGCPS staff. *Id.* At the meeting, T.B. stated that "he simply wasn't trying." *Id.* Throughout the rest of T.B.'s ninth grade year and his tenth grade year, T.B.'s absences became increasingly frequent, and he failed many of his classes. ALJ at 12. His parents did not inform PGCPS why T.B. was not attending school, nor did they mention anxiety or depression. *Id.* Mr. Barton emailed teachers and administrators at Friendly on the 6th and 8th of March 2014,

---

services and supplementary aids to be provided to the child, and anticipated frequency and duration of services. 20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. § 300.22. The IEP is developed by an "IEP Team," a group consisting of the child's parents or guardians, at least one regular education teacher of the child, at least one special education teacher of the child, a representative of the local educational agency (LEA), and an individual who can interpret evaluation results, often a school psychologist. *See* 20 U.S.C. 1414(d)(1)(B). Once the IEP is developed, the program or plan is reviewed "periodically, but not less frequently than annually." § 1414(d)(4)(A).

[7] What actually occurred at the Nov. 7, 2012 meeting was a factual issue litigated at-length at the administrative law hearing. The ALJ found, after hearing testimony and reviewing exhibits on the matter, that the IEP team "reviewed all available information and discussed whether certain specific testing was appropriate." ALJ at 10. The ALJ also found that Ms. Barton was provided with the procedural safeguards document at that meeting. *Id.* at 9.

3

asking for T.B. to be "tested for learning disabilities." ALJ at 13. Despite these requests, PGCPS did not test T.B. *Id.* At the end of school year 2013-2014, T.B. failed the tenth grade. ECF No. 1 at 17.

In the Summer of 2014, the Bartons took their son to the Basics Group Practice, LLC ("Basics Group" or "Basics") to be tested for special education. ALJ at 13. The Basics Group evaluated T.B. on May 6, 8, and 13, 2014. *Id.* On August 29, 2014, Basics concluded that T.B. had attention-deficit hyperactivity disorder (ADHD), a specific learning disability (SLD) with impairment in written expression,[8] and an unspecified depressive disorder. ALJ at 13; ECF No. 1 at 20. Over the Summer of 2014, the Bartons changed residences, and T.B. re-started his tenth grade year at Central High School in the Fall. ECF No. 1 at 20. T.B. only attended Central for a few days in September 2014, with his last day of attendance being on or about September 22, 2014. ALJ at 13. Mr. Barton sent emails to PGCPS, "making conflicting claims" as to why T.B. was not attending school. *Id.* "The emails variously claimed that the Student was not attending due to noise in the school, asthma, or to panic attacks." *Id.*

On January 13, 2015, the Bartons filed a due process complaint against Prince George's County Public Schools. ECF No. 1 at 22; Due Process Compl. An IEP team meeting was convened on January 26, 2015, at which point PGCPS agreed to conduct further academic and social/emotional evaluations with T.B. ALJ at 14. School Psychologist Vincent Tepe performed

---

[8] The IDEA covers certain categories of disabilities that adversely impact education. *See* 34 C.F.R. § 300.1 *et seq.* Among these disabilities are attention deficit hyperactivity disorder (ADHD) and specific learning disability (SLD). ADHD falls under "other health impairment" or "OHI." 34 C.F.R. § 300.8(c)(9). Other health impairment means "having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that — (i) Is due to chronic or acute health problems such as . . . attention deficit disorder or attention deficit hyperactivity disorder . . . and (ii) Adversely affects a child's educational performance." *Id.* Specific learning disability means "a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia." 34 C.F.R. § 300.8(c)(10).

the evaluations. *Id.* Mr. Tepe found that T.B. was eligible for special education under the

category of Emotional Disability.[9] *Id.* Mr. Tepe also found that T.B. was six years below grade

level in mathematics, five years below grade level in reading, and four years below grade level in

writing. ECF No. 1 at 23. On March 12, 2015 and again on April 4, 2015, the IEP team met and

determined that compensatory services for one calendar year in the form of five fee-waived

credit recovery courses would be offered to T.B., and that the Transition Program at Wise High

School ("Transition Program") would be an appropriate placement. ALJ at 15.

### B.  Procedural History

Following the filing of the Bartons' due process complaint, an administrative hearing was

held at the Maryland Office of Administrative Hearings over six separate days in the Summer of

2015 (June 12, 15, 16, and 17; July 27; and August 17) before Administrative Law Judge David

Hofstetter. ALJ at 2. The issues for decision were:

> (1)  What is the appropriate statute of limitations to this matter?
> (2)  Whether the Student was denied a free and appropriate public
>      education (FAPE)[10] during the parts of the 2013-2014 and
>      2014-2015 school years, which fall within the applicable
>      statute of limitations and; if so, what, if any compensatory
>      education should be provided to the Student to remedy that
>      denial.

---

[9] Emotional disability or "emotional disturbance" means "a condition exhibiting one or more of the following
characteristics over a long period of time and to a marked degree that adversely affects a child's educational
performance: (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors. (B) An
inability to build or maintain satisfactory interpersonal relationships with peers and teachers. (C) Inappropriate types
of behavior or feelings under normal circumstances. (D) A general pervasive mood of unhappiness or depression.
(E) A tendency to develop physical symptoms or fears associated with personal or school problems." 34 C.F.R. §
300.8 (c)(4)(i).

[10] Free and appropriate public education or "FAPE" means "special education and related services that -- (A) have
been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards
of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school
education in the State involved; and (D) are provided in conformity with the individualized education program
required under section 1414(d) of [20 U.S.C. § 1400 *et seq.*]." 20 U.S.C. § 1401(9). In matters asserting procedural
violations, a child is "deprived of a free appropriate public education" only if "the school system has violated the
IDEA's procedural requirements to such an extent that the violations are serious and detrimentally impact upon the
child's right to a free public education" or if the IEP is "not reasonably calculated to enable the child to receive
educational benefits." *Gerstmyer v. Howard Cty. Pub. Schs.*, 850 F. Supp. 361, 364–65 (D. Md. 1994).

(3) Whether the Parents are entitled to reimbursement for an Independent Educational Evaluation (IEE) of the Student conducted in May 2014.

ALJ at 3. The ALJ admitted a total of 97 exhibits from both parties — including student attendance information, progress reports, performance data, and correspondence dating back to 2003. ALJ at 3–7. He heard testimony from 21 witnesses, including 12 of T.B.'s teachers from middle school and high school, T.B.'s parents, and PGCPS guidance counselors and school psychologists. *Id.* at 7–8. The ALJ made 67 factual findings by a preponderance of evidence. *Id.* at 8–16. The ALJ rendered his 46-page decision on September 16, 2015.

With respect to the first issue, the ALJ found that a two-year statute of limitations applied, dating back two years from January 13, 2015, the date the Parents filed their due process complaint. He therefore limited Parents' "claims of violations" to the period between January 13, 2013 and January 13, 2015. The ALJ found that no misrepresentation or withholding of information occurred that would "toll or extend the statute of limitations." ALJ at 22–23.[11]

As to the second issue, the ALJ found that "it is clear that the Parent made, within the statute of limitations period, repeated requests for evaluation of the Student." ALJ at 24. He further found that "PGCPS erred in failing to respond to the Parents' requests and conduct a timely evaluation." *Id.* at 25. However, he concluded, based on the "entirety of the record," that "these procedural violations did not 'actually interfere' with the provision of a free and appropriate public education." *Id.* (citing *DiBuo ex rel. DiBuo v. Bd. of Educ. of Worcester Cty.*, 309 F.3d 184, 190 (4th Cir. 2002)) (quotations marks added). The ALJ explained, "[m]y reasoning is simple: the entirety of the record before me establishes that the Student simply does

---

[11] 20 U.S.C. § 1415(f)(3)(D) adds two exceptions that would toll the two-year statute of limitations set forth under 20 U.S.C. § 1415(f)(3)(C). These are that "the parent was prevented from requesting the hearing due to (i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint, or (ii) the local educational agency's withholding of information from the parent that was required . . . to be provided to the parent." *Id.*

not want to go to school." *Id.* Effectively, the ALJ concluded that even if T.B. had received special education services and supports, he would not have gone to school, or the supports would not have had a significant impact.

In reaching this conclusion, the ALJ did not credit Plaintiffs' experts and noted that T.B.'s diagnosis conflicted not only between the PGCPS expert and Plaintiffs' experts, but between Plaintiffs' own experts. Indeed, PGCPS School Psychologist Vincent Tepe found that T.B.'s diagnosis was "Emotional Disability," ALJ at 13; the Basics Group concluded that T.B.'s diagnosis was "Attention Deficit Hyperactivity Disorder, combined presentation, moderate; Specific Learning Disorder with impairment in written expression; and unspecified depressive disorder," ALJ at 14; and Dr. Stephan Silverman, who testified for Plaintiffs, concluded that T.B.'s diagnosis was "situational anxiety and depression," ALJ at 38. The ALJ noted the conflicting diagnoses of Plaintiffs' experts, stating that it "lead[s] me to question the credibility of both." *Id.* at 40. Additionally, the ALJ afforded little weight to Dr. Silverman's testimony, as Dr. Silverman "met with the Student only once and only briefly," "did not perform any testing on the Student," "did not engage in any therapy with the Student," and "did not have the Student perform any academic activity for him." *Id.* at 39. The ALJ found the same deficiencies to be true with Plaintiffs' other expert, Dr. McLaughlin. ALJ at 40–41.

Additionally, the ALJ found that the reasons that Parents gave PGCPS to explain T.B.'s absences varied and were often "unexplained." *Id.* at 35. ("Student's absences from 8th grade onward were due to asthma, nose bleeds, and an injury when he fell on some icy steps . . . however . . . the vast majority of his many, many absences were unexcused and unexplained."). *Id.* The ALJ did not credit T.B.'s father, as "the Father's testimony on almost every factual matter was unreliable and subject to frequent revision." ALJ at 35. For example, Mr. Barton

7

testified at the hearing that T.B. stopped attending Central because of bullying. *Id.* But later Mr.

Barton said bullying was not an issue at Central. *Id.* Thus, the ALJ found that Plaintiffs' claims

did not establish a "denial of FAPE." *Id.* at 36.

Regarding the third issue, the ALJ found that the Parents were not entitled to

reimbursement for the Independent Educational Evaluation (IEE). *Id.* The ALJ reviewed the

report from the Basics Group and found that the document did not establish that the evaluation of

T.B. was conducted by "trained and knowledgeable personnel." *Id.* at 28. He noted that the

examiner, Whitney Hobson, was a doctoral psychology intern and not a licensed psychologist.

*Id.* He further noted that the *curriculum vitae* of the Basics personnel, Hobson and Dr. Ricardo

Lagrange, were not entered into evidence, and that the Basics personnel did not testify at the

hearing. *Id.* at 28–29. Therefore, the ALJ concluded that the agency "'demonstrated' a failure to

show that the IEE meets 'agency criteria,'" and thus the Parents were not entitled to

reimbursement. *Id.* at 29.

In sum, the ALJ concluded "as a matter of law Parents have not established by a

preponderance of evidence that the Student was denied a free and appropriate public education

during the portion of the 2012-2013, 2013-2014, and 2014-2015 school years which fall within

the statute of limitations." ALJ at 46. The ALJ therefore found that "the Student is not entitled to

compensatory education at public expense." *Id.* Finally, the ALJ denied reimbursement for the

IEE. *Id.* The Bartons timely filed the instant Complaint in this Court on December 23, 2015 and

appeal the ALJ's Decision pursuant to 20 U.S.C. § 1415(i)(2). ECF No. 1.

## II.    STANDARD OF REVIEW

Under the IDEA, any party aggrieved by a decision reached at a due process hearing of

the state educational agency may bring a civil action in a district court of the United States. 20

8

U.S.C. § 1415(i)(2). A district court reviewing a decision of the educational agency "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate," § 1415(i)(2)(C).

A court reviewing an administrative decision under the IDEA conducts a "modified de novo review, giving 'due weight' to the underlying administrative proceedings." *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.,* 303 F.3d 523, 530–31 (4th Cir. 2002); *Wagner v. Bd. of Educ. of Montgomery Cty.*, 340 F. Supp. 2d 603, 611 (D. Md. 2004). In evaluating the administrative findings, findings of fact which are "made in a regular manner and have evidentiary support" are considered "prima facie" correct and a reviewing court that does not adhere to the factual findings must explain its deviation. *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). In determining whether such factual findings were "regularly made," a reviewing court "should examine the way in which the state administrative authorities have arrived at their administrative decisions and the methods employed." *Id.* Courts should be particularly hesitant to disturb the "ALJ's determinations of the credibility of witnesses" as "the fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility." *Wagner*, 340 F. Supp. 2d at 611 (quoting *Justin G. v. Bd. of Educ.*, 148 F. Supp. 2d 576, 588 (D. Md. 2001)); *see also Jana K. ex rel. Tim K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 600 (M.D. Pa. 2014) ("[a]bsent non-testimonial, extrinsic evidence to the contrary, the court must accept the Hearing Officer's credibility determinations.") (citing *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 529 (3d. Cir. 1995)).

Once the reviewing court has given the administrative fact-findings due weight, it is then "free to decide the case on the preponderance of the evidence." *Doyle*, 953 F.2d at 105. A district

court may, for example, "believe[] that the evidence considered as a whole point[s] to a different legal conclusion," despite accepting the factual findings of the officer below. *See Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 485 (4th Cir. 2011). In making its determination, however, districts courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Hartmann ex rel. Hartmann v. Loudoun Cty. Bd. of Educ.,* 118 F.3d 996, 1000 (4th Cir. 1997) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 206 (1982)). Pure questions of law are reviewed de novo. *See E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 514 (4th Cir. 2014) (discussing exhaustion of administrative remedies as "pure question of law"); *Damarcus S. v. District of Columbia*, Civil Action No. 15-851 (ESH), 2016 WL 2993158, at *3 (D.D.C. May 23, 2016) (discussing the proper statutory construction of IDEA as a "pure question of law"); *Jana K.*, 39 F. Supp. 3d at 595 (M.D. Pa. 2014) ("[t]he district court's review of the hearing officer's application of legal standards and conclusions of law . . . is subject to plenary review.").

Finally, "just as Plaintiffs were required to carry the burden of proof in the administrative hearing" *Weast v. Schaffer ex rel. Schaffer,* 377 F.3d 449, 456 (4th Cir. 2004), *aff'd*, 546 U.S. 49 (2005), Plaintiffs must also carry that burden in this court, as they are the party seeking relief. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *see also Wagner*, 340 F. Supp. 2d at 611 (describing Plaintiffs in IDEA cases as facing an "uphill battle").

### III.   ANALYSIS

The ALJ heard six days of testimony from 21 witnesses, reviewed 35 exhibits, and drafted a 46-page opinion detailing his factual findings and conclusions of law. From this Court's review of the record, it is clear that the ALJ's factual findings were "made in a regular

manner." *Doyle*, 953 F.2d at 105; *see also Sch. Bd. of the City of Suffolk v. Rose*, 133 F. Supp. 3d 803, 821 (E.D. Va. 2015) (finding that hearing officer's findings of fact were entitled to due weight where hearing officer "heard evidence from witnesses on direct, cross, and re-direct examination; admitted documentary evidence; ruled on objections; . . . and rendered a written final decision."). As will be discussed in more detail below, the ALJ's factual findings are also supported by the evidence and are therefore presumed to be prima facie correct. The Court will now address the three issues raised below, in turn.

### A. Statute of Limitations

In 2003, the Fourth Circuit held that "[a]n IDEA claim accrues when the parents of the disabled child knew or should have known of the injury or the event that is the basis for their claims. The injury in an IDEA case —the injury that allows a parent to bring suit—is an allegedly faulty IEP or a disagreement over the educational choices that a school system has made for a student." *R.R. ex rel. R.R. v. Fairfax Cty. Sch. Bd.*, 338 F.3d 325, 332 (4th Cir. 2003) (internal citations omitted). But until 2004, the IDEA did not have a specified statute of limitations. *See G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 608 (3d Cir. 2015). Since that time, amendments to the IDEA have added two provisions, 20 U.S.C. §§ 1415(f)(3)(C) and 1415(b)(6)(B), both seeming to address the applicable statute of limitations but with differing language, which has caused confusion. *Id.* at 609.

Section 1415(f)(3)(C) sets forth what appears to be the statute of limitations principle known as the discovery rule: "A parent or agency shall request an impartial due process hearing *within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint . . .*" 20 U.S.C. § 1415(f)(3)(C) (emphasis added).

11

Thus, under this provision, IDEA plaintiffs clearly have two years from the date they knew or should have known of the defendants' violation to file their due process complaint.[12]

The language of Section 1415(b)(6)(B) is less clear. That subsection provides for "[a]n opportunity for any party to present a complaint-- with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child; and which *sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint*, or, if the State has an explicit time limitation for presenting such a complaint under this subchapter, in such time as the State law allows . . ." § 1415(b)(6)(B) (emphasis added). Thus, the plain language of Section 1415(b)(6)(B) would suggest looking backward in time from the knew-or-should-have-known ("KOSHK") date. This has led to questions and confusion about whether (b)(6)(B) is an awkward re-statement of (f)(3)(C), a remedy cap of two years prior to the KOSHK date, or a hybrid "2+2" approach creating a four-year statute of limitations (two years prior and two years post KOSHK). *G.L.*, 802 F.3d at 610 (discussing inconsistent conclusions reached by district courts).

The Third Circuit in *G.L.* thoroughly analyzed the text and legislative history of the two subsections at issue. *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 611–26 (3d Cir. 2015). The Court will not repeat that analysis in its entirety here, but finds it persuasive and adopts the reasoning. At the end of its discussion, the Third Circuit explained that:

---

[12] Section 1415(f)(3)(D) also provides two exceptions that toll this two-year statute of limitations: "The timeline described in subparagraph (C) shall not apply to a parent if the parent was prevented from requesting the hearing due to-- (i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or (ii) the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent." § 1415(f)(3)(D).

> [A]bsent one of the two statutory exceptions found in §
> 1415(f)(3)(D), parents have two years from the date they knew or
> should have known of the violation to request a due process
> hearing through the filing of an administrative complaint and that,
> assuming parents timely file that complaint and liability is proven,
> Congress did not abrogate our longstanding precedent that "a
> disabled child is entitled to compensatory education for a period
> equal to the period of deprivation, but excluding the time
> reasonably required for the school district to rectify the problem."

*G.L.*, 802 F.3d at 626 (quoting *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d.

Cir. 1996)). In so holding, the *G.L.* court made clear that "the limitations period [in § 1415]

functions in a traditional way, that is, as a filing deadline that runs from the date of reasonable

discovery and not as a cap on a child's remedy for timely-filed claims that happen to date back

more than two years before the complaint is filed." *Id.* at 616. Thus, the first step in a statute of

limitations analysis for an IDEA claim is to establish what the "KOSHK" date is for the violation

at issue, and look forward two years to determine whether the complaint was timely filed.

At first blush, the ALJ in the present case seems to have taken a different approach,

instead starting with the date the complaint was filed and looking backward in time. Whether this

is an appropriate approach depends on whether the Court views Defendants' actions as a single

violation or a series of individual violations. If viewed as a single violation, the entire claim was

time barred when the Complaint was not filed by November 7, 2014, two years after the first

KOSHK date.[13] However, properly viewing this case as a series of violations,[14] the ALJ's

---

[13] The ALJ found that "as of November 7, 2012 (the date of the IEP team meeting), as well as by January 13, 2013 (the last date before prior claims would be barred by the statute of limitations), the evidence is overwhelming that the Parents knew or should have known all the facts supporting any alleged violation of the Student's rights under the IDEA prior to that date." ALJ at 24.

[14] In the Court's view, the "alleged action that forms the basis of the complaint" is best viewed as an aggregate of separate, related violations. Namely, "PGCPS has repeatedly failed to identify and evaluate Terrence, including ignoring specific requests by Terrence's family that PGCPS evaluate him." Due Process Compl. at 4. In the Due Process Complaint, Plaintiffs lay out multiple dates beginning in October 2012 and lasting through September 2014, where the Parents sent emails and contacted the school, requesting for T.B. to be evaluated and receive additional support in his classes. *Id.* Accordingly, the alleged action is not a single, overarching violation, but rather a series of violations.

approach of starting with the date the complaint was filed, looking backward two years, and including any violations within that two year period, is nothing more than a functional, efficient device to determine which claims are time-barred. All claims within those two years would have been deemed timely-filed had they been analyzed individually looking forward. Claims occurring outside of that two-year window would not be. Additionally, the ALJ considered extensively the potential applicability of the two statutory tolling exceptions under Section 1415(f)(3)(D), and properly found that neither exception applied, which would have allowed the Plaintiffs to include additional alleged violations. ALJ at 20–22 ("I therefore conclude that no misrepresentation or withholding of information occurred . . . and therefore there is no basis to extend the statute of limitations on that basis."). Thus, the determination and application of the statute of limitations was accurate.

However, while the ALJ properly found that only violations occurring after January 13, 2013 could be used to state a claim, the ALJ improperly found that only relief for injury suffered during that period would be recoverable. Pursuant to *G.L.*, decided after the ALJ's ruling but adopted herein, "a disabled child is entitled to compensatory education for a period equal to the period of deprivation." 802 F.3d at 626 (assuming liability is proven, "a disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem."); *see also Draper v. Atl. Indep. Sch. Sys.*, 518 F.3d 1275, 1286–90 (11th Cir. 2008) (rejecting a school district's argument that a child's long-undiscovered injury was time-barred and upholding an award of approximately five years of compensatory education).Thus, had a claim for denial of FAPE during the limitations period been established, damages for harm occurring before January 13, 2013, two years prior to the filing of the due process complaint, would have been available. This error is made harmless,

14

however, by the ALJ's determination, which this Court affirms, that there was no actual interference with the provision of FAPE.

Plaintiff additionally complains that the ALJ erred in using the limitations date as an evidentiary exclusion rule. ECF No. 27-1 at 31. That argument mischaracterizes the ALJ's ruling. The ALJ explicitly stated, "I have determined that the Parents' claims concerning events occurring before January 13, 2013 are barred by the statute of limitations. For historical and background purposes, however, I have nevertheless included in these findings of fact some information concerning events occurring before that date." ALJ at 9 n.7. Specifically, the ALJ included an email sent October 10, 2012 by T.B.'s father and the November 7, 2012 IEP meeting. Thus, the ALJ did not exclude that information cited to by Plaintiffs, but rather included information from that time period which he felt was relevant for historical and background purposes. Accordingly, the Court does not disturb the ALJ's decision as to the statute of limitations issue.

### B.  Child Find

IDEA "imposes an affirmative obligation on any state receiving federal assistance to identify and evaluate all children suffering from disabilities who may be in need of special education and related services." *Sch. Bd. of the City of Norfolk v. Brown*, 769 F. Supp. 2d 928, 941 (E.D. Va. 2010); *see* 34 C.F.R. § 300.111(a). This duty is known as "child find." *Id.* The child find obligation extends to "children who are suspected of being a child with a disability under § 300.8 and in need of special education, even though they are advancing from grade to grade." 34 C.F.R. § 300.111(c). Failure to comply with "child find" may constitute a "procedural violation" of the IDEA. *Brown*, 769 F. Supp. 2d at 942 (citing *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009)).

Although child find does not "impose a specific deadline by which time children suspected of having a qualifying disability must be identified and evaluated, evaluation should take place within a 'reasonable time' after school officials are put on notice that behavior is likely to indicate a disability." *Brown*, 769 F. Supp. 2d at 942 (citing *W.B. v. Matula,* 67 F.3d 484, 501 (3d Cir. 1995)). Hence, the child find obligation is "triggered where the state has reason to suspect that the child may have a disability and that special education services may be necessary to address that disability." *Id.* A local educational agency is "deemed to have knowledge that the child may suffer from a disability" where:

> i.     the parent of the child has expressed concern in writing to supervisory or administrative personnel of the appropriate educational agency, or a teacher of the child, that the child is in need of special education and related services;
>
> ii.    the parent of the child has requested an evaluation of the child pursuant to section 1414(a)(1)(B); or
>
> iii.   the teacher of the child, or other personnel of the local educational agency, has expressed specific concerns about a pattern of behavior demonstrated by the child, directly to the director of special education of such agency or to other supervisory personnel of the agency. 20 U.S.C. § 1415(k)(5)(B).

20 U.S.C. § 1415(k)(5)(B).

Here, the ALJ found that Mr. Barton made repeated requests for evaluation in the two-year period prior to the filing of the due process claim, and thus, "PGCPS erred in failing to respond to Parents' requests and conduct a timely evaluation." ALJ at 25. But even if the school's error in failing to identify or evaluate constituted a procedural violation, "procedural violations of IDEA are subject to harmlessness analysis." *Snyder ex re. Snyder v. Montgomery Cty. Pub. Schs.*, Civil Action No. DKC 2008-1757, 2009 WL 3246579 at *6 (D. Md. Sept. 29, 2009). Thus, "a violation of a procedural requirement of the IDEA (or one of its implementing

regulations) must actually interfere with the provision of a FAPE before the child and/or his parents would be entitled to reimbursement relief." *Id.* (emphasis added). A child is "deprived of a free appropriate public education" only if "the school system has violated the IDEA's procedural requirements to such an extent that the violations are serious and detrimentally impact upon the child's right to a free public education," or if the IEP is "not reasonably calculated to enable the child to receive educational benefits." *Gerstmyer v. Howard Cty. Pub. Schs.*, 850 F. Supp. 361, 364–65 (D. Md. 1994); *see also Sch. Bd. of the City of Suffolk v. Rose*, 133 F. Supp. 3d 803, 819 (E.D. Va. 2015) (equating denial of FAPE with "loss of an educational opportunity for the disabled child" as opposed to "mere technical contravention of the IDEA"); *Jana K. ex rel. Tim K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 603 (M.D. Pa. 2014) ("a school district is not obligated to conduct a formal evaluation of every struggling student and it may be prudent to offer other interventions before rushing to a special education identification.").

Plaintiffs argue that the ALJ "grievously erred," after making a finding that Defendants erred in failing to evaluate T.B., by concluding, in Plaintiffs' words, "that T.B. was essentially, beyond help – that, even if T.B. had been promptly evaluated and had been given the proper supports, T.B. would not 'have regularly attended school.'" ECF No. 27-1 at 34. Certainly, the Court is concerned about the notion that any child could be considered "beyond help" and, without context, would be troubled by the ALJ's conclusion that "the Student simply does not want to go to school," and that "whether with or without an IEP, and even with an IEP providing a small, self-contained special education classroom setting with only 8–12 students in the class, the Student will not go to school." ALJ at 25. In a vacuum, it is not difficult to imagine that if a child receives help in middle school, such help could lessen discouragement and the child's later reluctance to go to school. But this Court is not reviewing this matter in a vacuum and cannot

17

discard the informed opinions of T.B.'s educators and the credibility findings of the ALJ, who

had the advantage of hearing the testimony. *See Wagner v. Bd. of Educ. of Montgomery Cty.*, 340

F. Supp. 2d 603, 611 (D. Md. 2004) ("in according 'due weight' to the findings of the ALJ, this

court owes deference to the ALJ's determinations of the credibility of witnesses.").

     Upon considering the entirety of the record before him, the ALJ concluded that PGCPS's

failure to evaluate T.B. amounted to harmless procedural error, because, despite T.B.'s

difficulties, T.B. was a student of normal intelligence who was capable of doing the work when

he chose to do so. The ALJ heard testimony from no fewer than 11 of T.B.'s teachers, most of

whom indicated T.B. was able to produce satisfactory work, but refused to come to class or do

homework. Linda Wilkinson, who taught T.B. for ninth grade English, testified that he "failed

every quarter because he simply did not do the work." ALJ at 32. Ms. Wilkinson further stated

that "when he wanted to do the work, his work was satisfactory and he achieved some good

grades on assignments he completed." *Id.* Sam Kamara, who taught T.B. for tenth grade

Foundations of Technology, testified that "he was capable of doing the work required of him"

but "the Student simply didn't do homework and showed little effort or motivation." *Id.*

     Even teachers who attempted to accommodate T.B. fared no better. T.B.'s tenth grade Art

teacher, Anna Guiles Deskin, testified that "she gave the Student an opportunity to turn in work

later when he was absent, but that he never did so." Ms. Deskin testified that T.B. "showed poor

motivation and rarely did homework or classwork" but that "the work that the Student did turn in

was satisfactory." ALJ at 32. Jennifer Eller, T.B.'s tenth grade English teacher, testified that

when T.B. did come to class, "he was disruptive, talk[ed] with other students out of turn, used his

cell phone, refused to follow directions and made insulting statements to Ms. Eller." ALJ at 33.

Several teachers also testified that they notified T.B.'s Parents about his poor performance and

18

requested a meeting, but that the Parents never responded. *Id.* The ALJ found that "[m]ost if not all of the witnesses testified that they had referred students for special education in the past or that they were prepared to do so, but that there was no reason to suspect that the Student suffered from a learning disability or any other condition mandating special education services." ALJ at 30–31.

Additionally, Leatriz Covington, principal at Gourdine Middle School, testified that the rigors of middle school are much greater than those in elementary school. Hrg. Tr. vol. 1, 147–148. Ms Covington testified that it is not at all unusual for a student who is successful with As and Bs in elementary school to come to middle school and wind up with Ds and Es. *Id.* at 149. School Psychologist Vincent Tepe agreed, after evaluating T.B., that he was affected by an emotional disability; however, Mr. Tepe testified that "I didn't see any evidence of an emotional disability prior to Spring of 2014 in any of the records anywhere." Hrg. Tr. vol. 6, 1385. In sum, the Court cannot say that the school overlooked clear signs of either a learning disability or an emotional disability, particularly in light of T.B.'s frequent absences, conflicting explanations by the Parents, and the increased rigor of middle school and high school. *See Richard S. v. Wissahickon Sch. Dist.*, 334 F. App'x 508, 511 (3d. Cir. 2009) (affirming no Child Find violation where extensive evidence in the record showed that middle school student was "perceived by professional educators to be an average student making meaningful progress, but whose increasing difficulty in school was attributable to low motivation, frequent absences, and failure to complete homework."). Hence, the record is replete with evidence supporting the ALJ's findings.

In determining when a procedural violation of IDEA interfered with the provision of a FAPE, the Fourth Circuit's decision in *DiBuo* offers a helpful illustration. *See DiBuo ex rel.*

19

*DiBuo v. Bd. of Educ. of Worcester Cty.*, 309 F.3d 184, 191 (4th Cir. 2002)). In that case, the

ALJ found that a child with a speech-and-language disability was not entitled to "Extended

School Year" ("ESY") services during the summer; and thus, the school's earlier refusal to

consider the parents' independently-obtained private evaluations recommending ESY services

for the child, while a procedural error, did not "actually interfere" with the provision of FAPE.

*Id.* at 191. Parents appealed the decision of the ALJ, and the district court granted summary

judgment for the parents, holding that such refusal by the school "seriously infringed the parents'

opportunity to participate in the IEP formulation process." *Id.* at 188. On appeal, the Fourth

Circuit stated that if "a presumably correct finding is made" that a child with a disability does not

need a specific special education service, support, or other accommodation to receive a FAPE —

such as ESY services — the procedural failure to consider parents' private evaluations stating the

contrary "cannot be said to have actually interfered with the provision of FAPE to that child." *Id.*

Hence, if the ALJ in *DiBuo* was correct in finding that the child was not entitled to ESY services,

the ALJ was also correct in finding no denial of FAPE. Similarly here, the ALJ made a finding

that T.B. would not have attended school even if he had been tested, and this finding was

regularly made and supported by evidence. Giving due weight to the underlying proceedings,

this Court affirms the ALJ's conclusion that the procedural failure to respond to the Bartons'

request for an evaluation did not actually interfere with the provision of FAPE.

### C.  Reimbursement for the Independent Educational Evaluation

The ALJ next determined that the Bartons were not entitled to reimbursement for the

privately-procured Independent Educational Evaluation because the agency, PGCPS,

"'demonstrated' a failure to show that the IEE meets 'agency criteria.'" ALJ at 29. In addition to

contending that the ALJ was correct in reaching this conclusion, Defendants also posit a second,

alternative basis for upholding the ALJ's decision — namely that the regulation requires that the

parent disagree with an evaluation obtained by the public agency, and here there was no

evaluation performed with which the parents could disagree. ECF No. 28-1 at 42. Both issues

turn on the interpretation of provisions of 34 C.F.R. § 300.502(b). The regulation reads as

follows:

> b) Parent right to evaluation at public expense.
>
> > 1. A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency, subject to the conditions in paragraphs (b)(2) through (4) of this section.
> >
> > 2. If a parent requests an independent educational evaluation at public expense, the public agency must, without unnecessary delay, either —
> >
> > > i. File a due process complaint to request a hearing to show that its evaluation is appropriate; or
> > >
> > > ii. Ensure that an independent educational evaluation is provided at public expense, unless the agency demonstrates in a hearing pursuant to §§ 300.507 through 300.513 that the evaluation obtained by the parent did not meet agency criteria.

34 C.F.R. § 300.502(b). Plaintiffs argue that, in contravention of (b)(2)(ii), the ALJ improperly

shifted the burden to the parents to demonstrate that the independent evaluation from the Basics

Group "met agency criteria." ECF No. 27-1 at 56. Plaintiffs are correct. In reaching his

conclusion, the ALJ noted that Defendants had put forth testimony at the hearing criticizing the

conclusions of the report. *See* ALJ at 28; 34 C.F.R. § 300.502(b)(2)(ii). But the ALJ then stated,

"[w]ith one important exception, however, *Mr. Tepe and PGCPS did not clearly establish that*

*the report failed to meet 'agency criteria.'*" ALJ at 28 (emphasis added). Specifically, the ALJ

found that PGCPS did not establish that the Basics assessment was not "administered by trained

and knowledgeable personnel," which is one of the established criteria. 34 C.F.R. §

300.304(c)(1)(iv).

Given that (b)(2)(ii) requires the agency to demonstrate at a hearing that the evaluation did not meet agency criteria, if the ALJ's conclusion is that the agency did not meet this burden, that should end the matter. Nonetheless, the ALJ determined that "[i]f the school district were required to 'prove' that the evaluator was *not* trained and knowledgeable, it would allow virtually anyone to conduct an IEE for a parent and make it exceedingly difficult for the school district to 'prove a negative,'" ALJ at 29 (emphasis in original). But, as the ALJ acknowledges, the authors of the report could have been subpoenaed to testify at the hearing, and this Court is aware of no reason why that would have been difficult or burdensome to accomplish. ALJ at 29 n.12. Thus, the absurd outcome the ALJ was apparently seeking to avoid does not exist here, and there is no reason to believe that the drafters of the regulation did not mean what they said when they crafted language placing the burden on the agency to demonstrate that the IEE did not meet agency criteria. The Court is, however, unclear if the ALJ's qualifying statement, "with one exception," was intended as a conclusion that PGCPS did establish that the additional criteria, beyond the knowledge and training of the personnel, had not been met.[15] Thus, the Court will vacate and remand the decision on this issue for a determination or clarification of whether the agency met its burden of establishing that the report failed to meet agency criteria.

The Court will, however, also address Defendants' alternative argument that, because the regulation states that the right to an independent educational evaluation at public expense arises "if the parent disagrees with an evaluation obtained by the public agency," the public agency's evaluation of the child is a necessary condition precedent to the parents' right to the evaluation at public expense. ECF 28-1 at 43. The Court disagrees.

---

[15] For example, to the extent that there is a list of specific criteria, if the ALJ found that the agency established that some of the criteria had not been met, it would seem that the agency did carry its burden of establishing the report did not meet agency criteria; but it is unclear if that is what the ALJ intended in his ruling.

22

The record is clear, and the ALJ found, that the Parents made repeated requests for T.B. to be evaluated by the school over the course of at least two years, to no avail. ALJ at 24. It would make little sense to force Parents to wait for their child to be evaluated by the school, if the school was entirely, and improperly, unresponsive to a series of requests for an evaluation. *Cf. Learning Disabilities Ass'n of Maryland, Inc. v. Bd. of Educ. of Baltimore Cty.* 837 F. Supp. 717, 722-23 (D. Md. 1993) ("Exhaustion may be deemed futile 'where the state agency itself prevented administrative remedies from being exhausted'"); *Warren G. v. Cumberland Cty. Sch. Dist.,* 190 F.3d 80, 87 (3d Cir. 1999) (observing that requiring parents to notify school district before obtaining an IEE would "render the regulation pointless because the object of parents' obtaining their own evaluation is to determine whether grounds exist to challenge the District's.").

The ALJ determined that "PGCPS erred in failing to respond to the Parents' requests and conduct a timely evaluation." ALJ at 25. To hold that the parents could not, in this circumstance, obtain a publicly-funded evaluation would defeat the purpose of 34 C.F.R. § 300.502(b)(1), which is to provide parents with the ability to effectively challenge the decision of the school. *See Warren G.*, 190 F.3d at 87. Indeed, this case provides the example for why such a holding is necessary. Although the report was ultimately unpersuasive to the ALJ, without it, the Parents would have been entirely unable to challenge the decision Defendants did make, which was that T.B. should not even be evaluated. In essence, PGCPS had simply made an informal evaluation that T.B. was not disabled. In a circumstance such as this one, where the ALJ has found that the refusal to conduct a formal evaluation was improper, reimbursement for a private evaluation is appropriate. Defendants' citation to *G.J. v. Muscogee Cty. Sch. Dist.*, 668 F.3d 1258, 1266 (11th Cir. 2012) does not persuade this Court to reach a different conclusion. While it is true that the

23

Sixth Circuit in *G.J.* held that "[t]he right to a publicly funded independent educational evaluation does not obtain until there is a [evaluation or] reevaluation with which the parents disagree," *id.* at 1266, in that case, the reevaluation did not occur because the parents refused to consent to the reevaluation. Here, it is the Defendant's failure, not the parents', that led to the lack of evaluation.

However, because the Court is unclear as to whether the ALJ found the agency met its burden of establishing that the report did not meet agency criteria, the Court remands this part of the decision to provide the ALJ the opportunity to clarify his ruling in light of the Court's holding.

**IV.   CONCLUSION**

For the reasons stated above, Defendants' Cross Motion for Summary Judgment is granted with respect to the application of the statute of limitations and denial of compensatory education, and the ALJ's decisions on these issues are therefore affirmed. Plaintiffs' Motion for Summary Judgment is granted, in part, with respect to the denial of reimbursement for the independent educational evaluation, and the ALJ's decision on this issue is remanded for further proceedings or clarification. A separate Order shall issue.

Date: December 13, 2016

George J. Hazel
United States District Judge